# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| JENNIFER JERALDS, o/b/o ) | |
| COLTON DANE JERALDS, a minor, ) | |
| ) | |
| Plaintiff, ) | |
| ) | Case No: 08 C 4106 |
| v. ) | |
| ) | Magistrate Judge Jeffrey Cole |
| MICHAEL J. ASTRUE, ) | |
| Commissioner of Social Security, ) | |
| ) | |
| Defendant. ) | |
| ) | |

## MEMORANDUM AND ORDER

The plaintiff, Jennifer Jeralds, seeks review of the final decision of the Commissioner ("Commissioner") of the Social Security Administration ("Agency") denying her minor son Colton Jeralds' application for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act ("Act"), 42 U.S.C. §§ 1383(c)(3). Ms. Jeralds asks the court to reverse and remand the Commissioner's decision, while the Commissioner seeks an order affirming the decision.

### I.

### PROCEDURAL HISTORY

Ms. Jeralds applied for SSI on behalf of her son, Colton – born on December 2, 1993 – on August 22, 2005. (Administrative Record ("R.") 98-104). She claimed he had been disabled since the age of three (R. 98) due to attention-deficit hyperactivity disorder and attention deficit disorder. (R. 115). The application was denied initially and upon reconsideration. (R. 62-65, 67-71). Ms. Jusino continued pursuit of the claim by filing a timely request for hearing on March 30, 2006. (R. 76).

An administrative law judge ("ALJ") convened a hearing on May 15, 2007, at which Ms. Jeralds and her son, represented by counsel, appeared and testified. (R. 21-59). Dr. David Bascardi also testified, as a medical expert. (R. 21-59). On November 5, 2007, the ALJ issued a decision denying the application for SSI, because Colton did not have an impairment or combination of impairments that met or equaled the Listings. (R. 9-20). This became the final decision of the Commissioner when the Appeals Council denied Ms. Jeralds' request for review of the decision on May 21, 2008. (R. 1-4). *See* 20 C.F.R. §§ 404.955; 404.981. Ms. Jeralds has appealed that decision to the federal district court under 42 U.S.C. § 405(g), and the parties have consented to the jurisdiction of a Magistrate Judge pursuant to 28 U.S.C. § 636(c).

## II.
## EVIDENCE OF RECORD

### A.
### Medical and School Evidence

The medical record begins with the treatment notes of Dr. Sergio Mercado, covering November 2003 through July 2005. (R. 175-194). They are hand-written and generally illegible. Ms. Jeralds does not summarize the jottings, or cite to any of the notes to support her son's claim anywhere in her brief; she merely indicates that the compendium is a record of private medical treatment. (*Plaintiff's Memorandum*, at 5).[1]

---

[1] Ms. Jeralds' brief provides nothing more than a table of contents for the administrative record – which the administrative record already had. The brief simply cites each group of documents from each source in bulk. For example, for the records from Colton's treatment at the local health center it states: "08/17/04 to 09/01/05 records from Aunt Martha's Youth Services Center, Aurora, Il., (R, 200-300)" (*Plaintiff's Memorandum,* at 5). Citing one hundred pages of exhibits without any page reference is not helpful to the court, *Ammons v. Aramark Uniform Services, Inc*., 368 F.3d 809, 818 (7th Cir. 2004), and is a practice, the Seventh Circuit has repeatedly criticized. Judges are not "like pigs, hunting for truffles buried in briefs." *United States v. Dunkel,* 927 F.2d 955, 956 (7th Cir.1991). Nor are they archaeologists searching for treasure. *DeSilva v. DiLeonardi,* 181 F.3d 865, 867 (7th
(continued...)

Most appear to simply be indications that Colton's prescription would be refilled or that medication levels would be adjusted. There are also pages of childhood vaccination records. (R. 184-186, 193-194). A few notes appear to state that he's "doing good at school" (R. 177) or having a "problem at school" (R. 180) or getting "good grades at school." (R. 189).

The records also include about one hundred and fifty pages of hand-written notes from a health center near the Jeralds' home. (R. 200-300, 356-380, 430-452). Much of this history is illegible, and again, Ms. Jeralds does not indicate that any of it actually supports her son's claim. (*Plaintiff's Memorandum*, at 5). A great deal of the treatment record deals with medication levels and prescriptions. Colton was said to do better on medication than off it (R. 209, 214), or that he was doing "much better" on medication (R. 205, 364), doing very well (R. 221), doing "good!"(R. 359), "grades [were] better." (R. 361). Other notes say that dosages "worked very well." (R. 357). Or doing poorly (R. 323). Other notes indicate that his dosage needed to be adjusted (R. 209, 214, 218, 222, 223). There are pages of notes between the center and Colton's school to authorize the school to provide his proper dosages while he was there (R. 244-250, 254-60, 276-281). There are notes indicating that Ms. Jeralds was angry that her son was taken off medications when he experienced chest pains and that his prescription could not be re-started until the problem was resolved. (R. 229-231, 233, 274). Another note indicated

---

[1](...continued)
Cir.1999). It is simply not the court's job to sift through the record to find evidence to support a party's claim. *Davis v. Carter*, 452 F.3d 658, 692 (7th Cir. 2006). It is "[a]n advocate's job . . . to make it easy for the court to rule in his client's favor . . . ." *Dal Pozzo v. Basic Machinery Co., Inc.*, 463 F.3d 609, 613 (7th Cir. 2006).

3

that she was a poor source regarding her son's progress and that information from his school would be preferred. (R. 362).

At one point, someone from the health center appears to have observed Colton during school. (R. 286-290). They filled out a form indicating how often Colton exhibited a series of forty-three different problems. There is no legible date on the forms, but they appear to have been filled out on different days by the same person, whose name is also illegible. On one day, most of the responses indicate that Colton had problems "never" or "occasionally"; on the other, most responses indicate that he had problems often or very often.

Records from the school – a military school where Colton resided Monday through Friday – indicate that he was written up for behavioral incidents nine or ten times from December 11, 2003, through May 4, 2005. These ranged from not standing in line for medication at the proper time to disrupting class to altercations with other boys after school. (R. 328- 348).

Colton's fifth grade teacher filled out a questionnaire regarding his behavior for the school year. The teacher indicated that, in the "domain" of acquiring and using information, he had an obvious problem in expressing ideas in written form, but as for nine other areas such as comprehending instructions, reading and comprehending written material, learning new material, problem-solving, etc., he had no, or only slight, problems. (R. 386). In the "domain" of attending and completing tasks, he had an obvious problem focusing long enough to finish assigned tasks. (R. 387). Once again he had no, or only a slight, problem in a dozen other areas, including paying attention when spoken to, refocusing when necessary, carrying out multi-step instructions, waiting to

4

take turns, working at a reasonable pace, etc. (R. 387). In terms of interacting with others, Colton had an obvious problem with respecting and obeying adults. (R. 388). He had no, or only slight, problems with playing cooperatively, making and keeping friends, using appropriate language, and conducting conversations. (R. 388). Colton had no serious or very serious problems in any area. (R. 386-388).

Colton's sixth grade teacher filled out the same questionnaire. The teacher found, at worst, a slight problem in the area of comprehending and doing math problems, but no other problems at all in the domain of acquiring and using information. (R. 390). There were no problems at all in the domain of attending and completing tasks. (R. 391). In the domain of interacting with others, Colton had an obvious problem expressing anger appropriately; in nearly every other area there was no problem. (R. 392). There was no problem moving about and manipulating objects. (R. 394).

There is a report from Public School District 301 covering Colton's year in the seventh grade. (R. 482). He was ranked as average or above average in all areas except for: beginning work promptly, completing work adequately, and recognizing his own errors. (R. 482-483). Significantly, his behavior was ranked above average in nearly *all* areas, including cooperation, self-control, and consideration of others, and it was said that his behavior did not affect his academic progress and was not a factor in the classroom. (R. 483, 486). It was noted that his medication regimen contributed to his performance. His main problem seemed to be anxiety over his performance and fine motor skills – his handwriting was illegible (R. 484, 486) – (much like his medical caregivers). He had just one disciplinary problem the entire school year, an incident of bullying on February 27, 2007. (R. 489).

5

On October 25, 2005, the Agency arranged for Colton to undergo a consultative examination with psychologist John Peggau. (R. 317). Colton was 11½ and was attending the sixth grade at a military school at the time. (R. 317). Ms. Jeralds said he had been taking methylphenidate, an ADHD drug, or similar medications since he was 4. (R. 317). Colton displayed no abnormalities during the forty-five-minute examination – he interacted and behaved appropriately. (R. 317). He displayed no attention deficit or hyperactivity. (R. 318). His mental capacities were normal. He knew current events, could name five large cites, and could recall digits forward and backward. He could subtract sevens serially from one hundred, and had no trouble with multiplication or abstract thinking. (R. 318). His memory was in the high-average range. (R. 318). Dr. Peggau found his ADHD stable with medication, and assessed his GAF as 85.[2] (R. 319).

In January of 2007, Colton underwent a language skills evaluation. (R. 412-425). He "worked hard and was cooperative throughout the evaluation sessions." (R. 424). His "prompt answers made it clear he was listening and attending to the task." (R. 424). He had trouble expressing ideas orally, but his written sentence structure was more developed, which was said to be expected for his age group. (R. 424). He focused on details rather than main points, which impacted his expression of his thoughts. (R. 424). But he had strong decoding skills, which enabled him to read fluently. (R. 424).

---

[2] A Global Assessment of Functioning score, or "GAF", is a subjective assessment, on a one-hundred-point scale, of a patient's overall level of psychological, social, and occupational functioning. A score between 81 and 90 indicates "absent or minimal symptoms (e.g., mild anxiety before an exam)" and "good functioning in all areas . . . ." http://psyweb.com/Mdisord/DSM_IV/jsp/Axis_V.jsp.

## C.
### Administrative Hearing Testimony

### 1.
### Colton's Mother's Testimony

At the May 2007 hearing, Ms. Jeralds testified that Colton was doing a lot better, but that it had been a long road. (R. 30). She explained that at home she had several children: Colton and his brother, ages thirteen and fifteen, and Colton's half-sister, who was two years old. (R. 30). And she said she had "another girl that's older." (R. 30). Colton also had a half-brother and half-sister through his father. (R. 30). His mother said he had to be supervised at all times, either by his older siblings or she will pay someone to be with him. (R. 31). Ms. Jeralds pointed out that Colton had a penmanship problem. (R. 31). She said he wets his bed. (R. 32). It was a hygiene problem at the school, and she had to go out to the school and "go over his bed" repeatedly. (R. 47). Ms. Jeralds also testified that he has night terrors – he screams – throughout the night and must be supervised when he's sleeping. (R. 32).

Ms. Jeralds said she had to send Colton to military school because she got so many calls to take him home from public school she lost jobs. (R. 34). But that was back in the first grade. (R. 34). Now she is a school bus driver, and if there is ever a problem she has more time to go get him. (R. 39). He was suspended twice during his time at the military school. (R. 35). Most recently, Ms. Jeralds said that in January of 2007, he was suspended for making sexual comments to a female student. (R. 44). Ms. Jeralds stated that when Colton was off his medication, he was uncontrollable. (R. 36). When he was on, "[h]e functioned and listened and did well. . . ." (R. 48). By this she meant he "gets

up early tapping, slamming, running around room to room . . . constant talking, fast talking . . . ." (R. 36). Currently, he was on Methylphenidate and Risperal. (R. 45).

## 2.
## The Medical Expert's Testimony

Dr. Bascardi then testified as a medical expert, after reviewing all the evidence. (R. 42). He said that he also considered the fact that Colton was in a "behavior disorder school setting." (R. 51). The doctor said that he would be "hard pressed to find that he would function equal to a listing [impairment] even though taking everything into account [he] would have no problem finding a marked limitation in [Colton's] ability to care for himself in an age appropriate manner." (R. 51). Dr. Bascardi indicated it would be difficult to find a marked impairment in any other area. (R. 51). He would have liked to see IQ testing. (R. 52). He also indicated it would be helpful to have more information in how Colton cared for himself at the school, especially in the dormitory. (R. 57). The doctor indicated that this would also help him determine if the residential setting Colton was in was "masking" some problems. (R. 57). Ms. Jeralds said she could get the weekly reports from the house parent. (R. 57).

## D.
## The Post-Hearing Evidence

Following the hearing, the weekly reports of Colton's house parent, from September 2006 through May 2007, were added to the record on June 1, 2007. (R. 454). The reports rated the students' behavior in eleven areas on a weekly basis as outstanding, exceeds expectations, satisfactory, needs improvement, or unacceptable. Colton received no unacceptable ratings, but did get twelve "needs improvement ratings" over that period, most often for interacting appropriately with peers (R. 458, 459, 463, 466) and

poor study habits. (R. 451, 456, 458, 462). Aside from that, Colton was always rated as "satisfactory" or "exceeds expectations." (R. 455-69). Significantly, he always received an "exceeds expectations" in the area of hygiene, and there was no mention of any bed-wetting incidents. (R. 469). There was no mention of the night terrors that Ms. Jeralds described. There were just two disciplinary incident reports from the school year (R. 470-474): one for lying on September 18, 2007, and one for bullying another boy on February 26, 2007. (R. 472). There was also a report that Colton was sleepwalking on September 1, 2006. (R. 474). There was no mention of the sexual comment incident Ms. Jeralds alleged.[3]

Dr. Biscardi reviewed the record again on June 21, 2007. (R. 477-480). He opined that Colton's ADHD did not meet or equal a listed impairment, and that he had no marked limitation in any functional domain. (R. 477).

## III.
## THE ALJ'S DECISION

The ALJ stated that Colton, born on December 2, 1993, was a school-aged child on the date of his SSI application. (R. 12). He found that he suffered from the following

---

[3] Of course, an ALJ is not obligated to accept the word of an applicant. *Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir. 1996). Under the Social Security Act, administrative law judges are not inert and wooden participants in an empty ritual, the preordained end of which is to award benefits to those in distress, regardless of whether they qualify under the Act. The purpose of a social security hearing is to enable the ALJ to determine where the truth lies and to administer the Act in conformity with Congress's carefully crafted statutory framework. *Rogers v. Barnhart,* 446 F.Supp.2d 828, 834 -835 (N.D.Ill. 2006). The ALJ's credibility determinations are entitled to special deference because the ALJ has the opportunity to observe the claimant testifying. *Castile v. Astrue,* 617 F.3d 923, 928-29 (7th Cir.2010). Rather than nitpick the ALJ's opinion for inconsistencies or contradictions, we give it a commonsensical reading. *Id.* Where, as here, a particular bit of testimony is contradicted by other evidence it is up to the ALJ to determine which is more persuasive and credible. Accordingly, we reverse credibility determinations only if they are "patently wrong." *Jones v. Astrue,* 623 F.3d 1155 (7th Cir.2010).

9

severe impairment: attention deficit hyperactivity disorder ("ADHD"). (R. 12). The ALJ recounted the medical expert's testimony and said he agreed that the impairment did not meet or equal a listed impairment. (R. 12-13). There was also no functional equivalency in terms of any of the six functional domains. (R. 13). The ALJ noted how well Colton did at school – behaviorally and academically – when he was on medication. (R. 14). He considered reports from school, health care providers, and the medical expert to conclude that Colton had less than marked limitations in: acquiring and using information, attending and completing tasks, interacting and relating with others, moving about and manipulating objects, caring for himself at an appropriate level for his age, and health and physical well being. (R 15-20). As a result, the ALJ concluded that Colton was not disabled and not entitled to SSI. (R. 20).

## IV.
## DISCUSSION

### A.
### The Standard of Review

The applicable standard of review of the Commissioner's decision is a familiar one. The court must affirm the decision if it is supported by substantial evidence. 42 U.S.C. §§ 405(g). Substantial evidence is such relevant evidence as a reasonable mind might accept to support a conclusion. *Berger v. Astrue*, 516 F.3d 539, 544 (7th Cir. 2008), *citing Richardson v. Perales*, 402 U.S. 389, 401 (1971). The court may not reweigh the evidence, or substitute its judgment for that of the Social Security Administration. *Berger*, 516 F.3d at 544; *Binion on Behalf of Binion v. Chater*, 108 F.3d 780, 782 (7th Cir. 1997). Where conflicting evidence would allow reasonable minds to differ as to whether the plaintiff is disabled, the Commissioner has the responsibility for resolving

those conflicts. *Binion*, 108 F.3d at 782. Conclusions of law are not entitled to such deference, however, so where the Commissioner commits an error of law, the court must reverse the decision regardless of the volume of evidence supporting the factual findings. *Schmidt v. Astrue*, 496 F.3d 833, 841 (7th Cir. 2007).

While the standard of review is deferential, the court cannot act as a mere "rubber stamp" for the Commissioner's decision. *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002). In order for the court to affirm a denial of benefits, the ALJ must "minimally articulate" the reasons for his decision. *Berger*, 516 F.3d at 544; *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). This means that the ALJ "must build an accurate and logical bridge from [the] evidence to [the] conclusion." *Dixon*, 270 F.3d at 1176; *Giles ex rel. Giles v. Astrue*, 483 F.3d 483, 486 (7th Cir. 2007). Although the ALJ need not address every piece of evidence, the ALJ cannot limit his discussion to only that evidence that supports his ultimate conclusion. *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994). The ALJ's decision must allow the court to assess the validity of his findings and afford the plaintiff a meaningful judicial review. *Scott,* 297 F.3d at 595. In other words, as with any well-reasoned decision, the ALJ must rest a denial of benefits on adequate evidence contained in the record and must explain why contrary evidence does not persuade. *Berger*, 516 F.3d at 544.

### B.
### Sequential Analysis

A child is disabled under the Act if he has a "physical or mental impairment, which results in marked and severe functional limitations, and . . . has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(C)(I). Whether a child meets this definition is determined via a multi-step

11

inquiry. 20 C.F.R. § 416.924(a); *Murphy v. Astrue*, 496 F.3d 630, 633 (7th Cir. 2007); *Giles ex rel. Giles v. Astrue,* 483 F.3d 483, 486-87 (7th Cir.2007). At the outset, if the child is engaging in substantial gainful activity, his claim will be denied. *Murphy*, 496 F.3d at 633; *Giles,* 483 F.3d at 486. Next, if he does not have a medically severe impairment or combination of impairments, his claim will be denied. *Murphy*, 496 F.3d at 633; *Giles,* 483 F.3d at 486. Finally, the child's claim will be denied unless his impairment meets, or is medically or functionally equivalent to, one of the listed impairments in 20 C.F.R. Pt. 404, Subpt. P, App. 1. *Murphy*, 496 F.3d at 633; *Giles,* 483 F.3d at 486-87.

The determination of functional equivalency involves a further analysis of the child's condition in the context of six "domains" or categories, from an age-appropriate standpoint: 1) acquiring and using information, 2) attending and completing tasks, 3) interacting and relating with others, 4) moving about and manipulating objects, 5) caring for oneself, and 6) health and physical well-being. 20 C.F.R. § 416.926a(a), (b)(1); *Murphy*, 496 F.3d at 633; *Giles*, 483 F.3d at 487. A child's impairment is functionally equivalent to the listings, meaning the child qualifies for benefits, if the ALJ finds he has marked difficulty in two domains of functioning or an extreme limitation in one. 20 C.F.R. § 416.926a(a); *Murphy*, 496 F.3d at 633; *Giles*, 483 F.3d at 487. A marked limitation is one which interferes seriously with the child's ability to independently initiate, sustain, or complete activities. 20 C.F.R. § 416.926a(e)(2)(I); *Giles*, 483 F.3d at 487. It is further defined as "more than moderate, but less than extreme," and can be demonstrated by standardized test "scores that are at least two, but less than three standard deviations below the mean." 20 C.F.R. § 416.926a(e)(2)(I). An extreme

limitation is present where the results of a standardized test are three or more standard deviations below the norm for the test, or when an impairment interferes very seriously with the child's ability to independently initiate, sustain, or complete activities. *See* 20 C.F.R. § 416.926a(e)(3).

## C.
## The ALJ Correctly Found in Favor of the Commissioner

After a review of the record, and the ALJ's decision, there is no other conclusion than the ALJ's decision is supported by substantial evidence. Throughout the year in the fifth, sixth, and seventh grades, Colton's teachers reported he had minimal behavioral difficulties and had made good academic progress. He seemed to improve from one year to the next in both areas. Reports from his house parent, with a few exceptions, were similarly upbeat. Nothing from the school suggested things were so dire as Ms. Jeralds painted them in her testimony, which is not to denigrate the struggles she undoubtedly has had raising her children.

The medical expert reviewed all this evidence and determined that Colton's impairment was not functionally equivalent to a listed impairment. At the hearing, the doctor had some qualms about the domain of caring for one's self and the structured setting at the school masking problems Colton might have, but those were assuaged by the additional evidence added to the record after the hearing. Once he reviewed it, he issued his revised opinion without any reservations. The fact that Dr. Biscardi reviewed the entire record strengthens the weight of his conclusions. *Flener ex rel. Flener v. Barnhart*, 361 F.3d 442, 448 (7th Cir. 2004).

The ALJ adopted the medical expert's opinion to support his conclusion. There was no contrary opinion in the record. The only other medical report that gave any

indication of Colton's level of functioning was from the consultative examiner, who gave Colton a GAF score that suggested he had only minimal symptoms. So it was entirely appropriate for the ALJ to rely on the medical expert's opinion to conclude than Colton was not disabled under the Act. *See Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010)("The ALJ was entitled to rely on medical experts when no contrary evidence is presented."); *Young v. Barnhart*, 362 F.3d 995, 1001-02 (7th Cir. 2004).

Moreover, Colton's teachers, especially his most recent teachers, provided reports that indicated his symptoms were not so significant that they affected his school performance. The problems identified in his seventh grade report were essentially limited to his handwriting and anxiety before tests. These reports further bolster the ALJ's decision. *Flener ex rel. Flener v. Barnhart*, 361 F.3d 442, 448 (7th Cir. 2004).

The only criticism Ms. Jeralds has of the ALJ's decision is that it failed to consider the effects of the structured setting. She says she requested the ALJ to consider this point in a letter dated September 24, 2007 (R. 498), but that the ALJ failed to do so. She also points out that the applicable regulation makes a "structured setting" a part of calculus in a child's disability determination. *See* 20 C.F.R. § 416.924a(b)(5)(iv)(B);(C). The ALJ not only considered this factor – he specifically referred to and rejected the argument (R. 14) – but the medical expert obviously gave it thought as well. Once additional information from Colton's school – specifically, information regarding his daily and nightly life in the dorms – was added to the record, Dr. Biscardi reviewed it, and opined that Colton did not have an impairment that met, equaled, or was functionally equivalent to a listed impairment. The conclusion may not be the same one Ms. Jeralds or even a reviewing court might have, but all that was necessary was that the ALJ's

opinion demonstrate that he considered the required evidence. *Flener*, 361 F.3d at 448 ("Because the ALJ analyzed the correct criteria and relied on appropriate medical evidence, a reasonable person could accept his decision as adequate.").

## CONCLUSION

We review the ALJ's decision directly, but we play an "extremely limited" role. *Elder v. Astrue,* 529 F.3d 408, 413 (7th Cir.2008). We will not "displace the ALJ's judgment by reconsidering facts or evidence, or by making independent credibility determinations." *Id.* Instead, we look to whether the ALJ built an "accurate and logical bridge" from the evidence to [the] conclusion that the claimant is not disabled. *Craft v. Astrue,* 539 F.3d 668, 673 (7th Cir. 2008). We will affirm the ALJ's decision if it is supported by substantial evidence, which is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Barnett v. Barnhart,* 381 F.3d 664, 668 (7th Cir.2004). Therefore, "even if 'reasonable minds could differ concerning whether [Colton] is disabled,'" we affirm if there is substantial evidence to support it. *Simila v. Astrue,* 573 F.3d 503, 513 -514 (7th Cir.2009). Here, there is.

The plaintiff's motion for reversal and remand is DENIED, and the Commissioner's motion for summary judgment is GRANTED.

ENTERED: /s/ Jeffrey Cole
UNITED STATES MAGISTRATE JUDGE

**DATE:** 12/8/10

15